State
vs.
Henry D. Bellin,
Irving Pollay,
Joseph Golden,
Arthur Brody,
Benjamin Saxe,
William M. Peacock

} Indictment
No. 16317

DECISION.

January 25, 1934.

WALSH, J. This indictment is in four counts and charges the six defendants named therein with conspiracy to cheat and defraud the Rhode Island Mortgage Security Corporation, a Rhode Island corporation, and others. The indictment was returned December 7th, 1931, and charges that the alleged conspiracy and alleged fraudulent acts connected therewith took place between February 1st, 1928, and September 13th, 1929.

Rhode Island Mortgage Security Corporation was authorized to do business in the State of Rhode Island in March, 1928. On April 23rd, 1928, application for the sale of stock in Rhode Island Mortgage Security Corporation was filed with the Bank Commissioner and was approved by him on May 12th, 1928. In these applications was a provision to the effect that the commission to be allowed salesmen for the sale of this stock should not exceed 12½% of the actual sales and that expenses for advertising, circularization, and so forth, should not exceed another 12½% of said sales. Defendants Saxe, Golden and Brody filed applications with the Bank Commissioner to sell stock of Rhode Island Mortgage Security Corporation, which were approved by said Bank Commissioner. There was no official record in the office of the Bank Commissioner of defendant Pollay's connection with the company at any time.

On April 23rd, 1928, Augustus A. Greene, William H. Bowker, A. Henry Klein and Henry D. Bellin were elected as directors of Rhode Island Mortgage Security Corporation. Operations started to solicit subscriptions for stock and to carry on a business of advancing money on second mortgages about June 1st, 1928.

From June 1st, 1928, to October 30th, 1928, the business apparently flourished and was conducted expeditiously. The State claims that beginning June 9th, 1928, and extending until Septem-

ber 13th, 1929, certain criminal acts were committed by these defendants in pursuance of a conspiracy to defraud Rhode Island Mortgage Security Corporation of its assets.

We find the following facts to be established by the evidence beyond a reasonable doubt, viz.:

(1) Bellin conceived the idea of forming a corporation in the State of Rhode Island to carry on the business of lending money upon second mortgages.

(2) In January or February, 1928, Bellin conferred with Pollay and Golden about this matter. Pollay and Golden were at that time officers of the Franklin Mortgage Company, a corporation engaged in the business of lending money on second mortgages in Boston and vicinity. Pollay and Golden had many years' experience in selling stock in similar ventures.

(3) That Bellin, Pollay and Golden were thoroughly informed of every step in the formation of the Rhode Island Mortgage Security Corporation; the preparation of its constitution and by-laws, reports thereof to the Bank Commissioner, etc.

(4) That Pollay advanced to Bellin the sum of $400. to pay the expenses of incorporation of the Rhode Island Mortgage Security Corporation.

(5) That Pollay, for himself and Golden, gave to Bellin the sum of $3,000 for the purpose of buying the voting stock of the Rhode Island Mortgage Security Corporation. It is true that Pollay and Golden say that they lent this sum of money to Bellin and took Bellin's promissory note for the same, yet at the time it appears that Bellin's brother-in-law, A. Henry Klein, had put into the company $3,000 for voting stock of the corporation; that Bellin used $1500 of the money paid by Pollay to purchase 3000 shares, gave Greene $1,000 of the same to purchase 2000 shares, and gave Bowker $500 of the same to purchase 1000 shares, all of the voting stock of this corporation; thus Bellin, Klein, Greene and Bowker controlled 12,000 voting shares and at no time in the history of the corporation were there more than 17,500 shares of the voting stock issued and outstanding at any one time. It is quite clear, therefore, that Pollay and Golden and Bellin had in mind the control of the voting stock of this corporation when Pollay and Golden gave this check for $3,000 to Bellin.

(6) That Pollay as supervisor of sales and Golden as his assistant took over the sale of stock in unit form for the new corporation and that Pollay hired Saxe and Brody as salesmen. It is clear that Saxe and Brody received their instructions from Pollay, Golden and Bellin, did not have access to the books of the corporation, knew nothing about the activities of Pollay, Golden and Bellin concerning the 1,000 shares of common stock issued to Pollay as hereinafter mentioned; in fact the issue of said stock was kept secret by Pollay, Bellin and Golden. There is no evidence whatsoever connecting Saxe and Brody with any conspiracy nor that they received any profit from said corporation except the commissions that Pollay, Bellin and Golden promised to pay them for their services.

(7) That at the meeting of the stockholders of June 9th, 1928, all the stockholders of record were not present and voting, despite the official record of the meeting. Jeremiah E. O'Connell had bought $1,000 worth of the stock on May 2, 1928, and there were two or three others who had paid for their stock and were entitled to vote but were not present. At that meeting 6000 shares of A. Henry Klein, Bellin's brother-in-law, and 6000 shares bought with the money lent by Pollay voted to issue 1000 shares of the common stock to Pollay as a bonus.

(8) That the transactions in regard to the sale of unit stock of this corporation were carefully recorded in the books of the corporation by competent bookkeepers and that the entries in reference to said unit stock were made honestly in the regular course of business.

(9) That the 1000 shares of common stock were issued to Pollay on October 31, 1928, by the Industrial Trust Company, and were receipted for by Dorothy Markowitz, stenographer in the office of Mr. Bellin. That on or about October 31, 1928, Bellin procured the signature of William M. Peacock to four notes for $5000 each payable to Rhode Island Mortgage Security Corporation on demand, upon which notes appear the 1000 shares of Pollay stock as being deposited as collateral security. That Bellin used these notes to procure a loan of $20,000 from the Rhode Island Mortgage Security Corporation. That Bellin procured the endorsement of William M. Peacock on the back of two checks of the Rhode Island Mortgage Security Corporation, one for $5,000 dated November 1, 1928, one for $15,000 dated November 9, 1928. That Bellin took the cash received of $20,000 and Pollay received $6,500, Golden received $6,500 and Bellin received $7,000 out of the proceeds. Pollay and Golden say that the $13,000 they received was $3,000 in payment of the loan to Bellin for the purchase of common stock and $10,000 for the 1000 shares of Pollay bonus stock sold to Bellin individually. It is quite clear the $20,000 of the money of the Rhode Island Mortgage Security Corporation was embezzled in this transaction. Peacock was the catspaw. He was inveigled into signing his name to the notes from the feeling that he owed Bellin a favor for Bellin's assistance to him and his wife in procuring a mortgage for him. Peacock got no benefit or advantage from the transaction, was promised nothing and was totally ignorant of the use intended for his notes. Peacock never owned a share of stock in the Rhode Island Mortgage Security Corporation.

(10) That in an attempt to cover up the alleged $20,000 loan to William M. Peacock, a plan was devised to sell common stock alone with a view to selling this Pollay stock at $50 or more per share in place of the treasury stock of the corporation. In furtherance of this plan, the heretofore regular entries of subscription blanks, of making all payments by check and of keeping the salesmen's commissions within the 25% limit, as recorded in the office of the Bank Commissioner, were abandoned. Bellin kept the records of these sales in seventy-one envelopes (State's Exhibit 50) secretly in his private safe. No records of these sales were made on the regular books of the corporation. Golden, for himself and Pollay, collected a gross commission of 30% regularly on all sales. Pollay in the Dolbey sale, although he knew that the salesman had received $1000 commission on a $5000 sale, demanded a further 10% commission for himself and ultimately received $250 thereon. Pollay, Golden and Bellin knew that their duty to the company required them to sell the company's stock and to keep and record the transactions in regard to said sales in the books of the company and in the regular course of business. Despite this duty, they all knew that this money was being handed in to Bellin and was being applied on the books to the payment of the Alice T. Peacock 36-C account (the fictitious account created to cover the $20,000 alleged loan to William M. Peacock). Golden, for himself as agent for Pollay, signed receipts and endorsed checks for these sales. Golden and Pollay had an understanding that they would share equally in all moneys received by either of them as a result of their connection with the Rhode Island Mortgage Security Corporation.

While Pollay says he was through with the company about the middle of January, 1929, we have his letters of February 1, 1929, asking that all his commissions be paid to Golden, and of April 15, 1929, in regard to dividends on common stock standing in his name. We also have the testimony of Sam Dolbey that Pollay was in Providence on March 1, 1929, doing business with Mr. Dolbey for the Rhode Island Mortgage Security Corporation. Pollay did not deny that he shared fifty-fifty with Golden in all the money received by Golden from the J. Golden exchange account. All these actions by Pollay and Golden, viewed in the light of their long joint experience in transactions of this kind, cannot be taken as indications of their innocence of what was going on in the office of the Rhode Island Mortgage Security Corporation. Taking the total receipts from all these seventy-one envelopes (State's Exhibit 50), we find that approximately $50,000 gross, which should have been turned in to the treasury of Rhode Island Mortgage Security Corporation, was diverted, first, to the payment of the $20,000 previously embezzled from the company, and the balance to the account of "J. Golden Exchange" into the pocket of J. Golden, who acted for himself and as agent for Pollay.

(11) That Bellin in pursuance of the common plan to get 1000 shares of bonus stock for Pollay dominated the alleged meeting of the stockholders held June 9th, 1928. The only ones present were Klein, Bellin's brother-in-law, Greene, an aged and retired jeweler, who, Miss Levine said, would sign checks in blank for Bellin, Bowker, who was a rubber stamp for Bellin, and Bellin himself. That the same reasoning applies to the alleged ratification by the Executive Committee on December 8th, 1928, of the issue of 1000 shares of bonus stock to Pollay, is evident when we read that the Executive Committee at that time was composed of A. Henry Klein, Chairman, Henry D. Bellin, Clerk, and Augustus A. Greene.

(12) That Pollay and Golden both knew of and approved the sale of the 1000 shares of Pollay stock in opposition to the practice in the office of the Rhode Island Mortgage Security Corporation because of these facts: (1) the salesmen were often paid commissions in cash and not by check; (2) commissions of 30% were usually collected; (3) subscriptions were not entered in the subscription book; (4) such subscriptions were not included in the weekly report and weekly bill of salesmen; and (5) receipts as to the person from whom the commission was received were signed very frequently with the name of the payer left blank.

(13) That Pollay knew of the irregularity of the sale of the Pollay stock on November 28th, 1928, when he gave a receipt to Bellin, not on the regular form used in the office but on a white filing card, reading as follows: "Nov. 28, 1928, Received from Mr. Bellin $250 x/100 (Two hundred fifty dollars) Irving Pollay." This receipt referred to the Sam Dolbey sale in one of the seventy-one envelopes kept secretly in his safe by Bellin. (State's Exhibit 50, envelope No. 1). This is corroborated by State's Exhibit 35, Journal, page 7, where the following entry appears:—"To record Sam Dolbey's note for $2,500, received from Pollay for discount and due January 6, 1929, $2.000;" also, "I. Pollay $2,000 proceeds given to Pollay."

(14) That Pollay retained his connection with the company long after January 15th, 1929. Miss Levine's testimony that she was bookkeeper in the office of the Rhode Island Mortgage Security Corporation during this whole period and that she never heard of Pollay's getting through with the company and never knew of any resignation by him from the company is most convincing.

(15) That Pollay and Golden were interested in having local men of substance and reputation as directors of Rhode Island Mortgage Security Corporation for the sole purpose of inducing the purchase of stock.

(16) That Pollay did meet Sam Dolbey in the office of Rhode Island Mortgage Security Corporation on March 1st, 1929, and did ask Mr. Dolbey to endorse in blank a certificate for 100 shares of stock "to pay back the 100 shares to the man that had loaned them to us."

Conspiracy in the law is the combination or confederation of two or more persons to do an illegal act or to do a lawful act in an unlawful manner. The objective to be attained by the conspirators must be a common objective. Concerted action to attain the unlawful end, or to countenance the use of unlawful means in attaining the lawful end, is an element. The basis of the conspiracy is the undertaking or agreement between the conspirators. This understanding, undertaking or agreement entered into by the conspirators must be shown beyond a reasonable doubt. Conspiracies generally are hatched in the dark and are reared in secrecy, hence it is sometimes very difficult for the State to produce clear and convincing evidence of an actual agreement between the conspirators. A strong and convincing chain of circumstantial evidence showing concerted action according to a definite plan to attain the common end by the use of unlawful methods, or for an unlawful purpose, is accepted by the Courts as proof of the formation of an agreement. Bellin, Pollay and Golden had such an understanding when they planned to get the 1000 shares of Pollay common stock from the company. This stock could be used but for three purposes: first, to control the company; second, to borrow the company's funds, using the stock as collateral security, and, third,

to sell it to subscribers in place of the treasury stock of the company and take the proceeds for themselves. There was no market for this common stock outside of the company and there was no value to this stock outside of the company. The facts show that possession of these 1000 shares by Pollay, Bellin and Golden resulted in the conspirators accomplishing all three results as above outlined. With Klein's assistance, they controlled the company and elected directors who would act as "window dressing" for stock sales but who were kept in the dark about secret files and disposition of the company's money. Pollay, Bellin and Golden used the stock with the bogus notes of Peacock to get into their possession $20,000 worth of the company's cash, which they divided about equally amongst themselves, and, lastly, they used this same stock to sell for common stock to subscribers who were led to believe that they were buying treasury stock of the company and that the company was receiving the cash so subscribed, the proceeds of said sales going into the pockets of one or more of these conspirators.

Taking into consideration all the evidence, no reasonable person can come to any other conclusion than that Pollay, Bellin and Golden from the very inception of the Rhode Island Mortgage Security Corporation had in mind a common plan to raise money from the sale of stock in this corporation and, by concerted action in procuring 1000 shares of the common stock for Pollay to be used for the purposes above outlined, to divert a large amount of said money to their own private purposes to the loss of said corporation and its subscribers. Therefore, we adjudge Henry D. Bellin, alias, Irving Pollay, alias, and Joseph Golden, alias, to be guilty of the crime of conspiracy as charged in the indictment.

All defendants in a criminal case are protected by a presumption of innocence. Until this presumption of innocence is overcome by evidence of guilt beyond a reasonable doubt, no Court is justified in adjudging a respondent guilty of any charge brought against him. It is the duty of the Court to weigh and analyze the evidence with a view to determining if such evidence harmonizes with the presumption of innocence. So in this case, reviewing the evidence against Saxe and Brody, we are led to conclude that the evidence against them does not overcome the presumption of their innocence of the crime as charged. There is no evidence that they knew of the plan of Bellin, Pollay and Golden; that they knew of the issue of the 1000 shares of common stock to Pollay (in fact, Pollay and Golden testified that they never told them of such issue) ; that they knew of the Peacock transaction; that they knew that the money of the corporation was going elsewhere than into the treasury of the corporation. They were hired as salesmen and were justified in accepting as large a sum for their service as their superiors Pollay, Bellin and Golden were willing to pay them. The State not having overcome the presumption of innocence attaching to defendants Arthur Brody and Benjamin Saxe, by evidence of their guilt as charged beyond a reasonable doubt, cannot prevail, and we adjudge defendants Arthur Brody and Benjamin Saxe not guilty of the offence charged in the indictment.

The same presumption if innocence attaches to defendant William M. Peacock. While Peacock should have known from his experience as a real estate dealer that the giving of his four notes to Bellin was irregular, there is no conflict in the evidence introduced against him by the State with the proposition that he acted as an innocent man might have acted under the same circumstances. Hence, because the State has not introduced evidence beyond a reasonable doubt to overcome the presumption of his innocence of the crime as charged, we adjudge respondent William M. Peacock not guilty of the charge made against him in the indictment.

Attorneys for Henry D. Bellin: Daniel T. Hagan, Esquire; Frank H. Bellin, Esquire.

Attorney for William M. Peacock: James J. McGovern, Esquire.

Attorneys for Pollay, Golden, Brody & Saxe: Anthony Pettine, Esquire; Edmund Godfrey, Esquire; Maurice Jacobs, Esquire, of Massachusetts Bar.